**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

O.M.G., *et al.*,

> Petitioners,

> v.

CHAD WOLF, *et al.*,

> Respondents.

Civil Action No. 20-786 (JEB)

**MEMORANDUM OPINION**

While the COVID-19 pandemic has disrupted lives throughout our country, in few places has it proved more contagious than in congregate settings like prisons or detention centers. This case concerns three such settings known as family residential centers (FRCs), communal immigration-detention facilities reserved exclusively for migrant families. Petitioners are over 200 detainees currently held at the three FRCs, two of which are located in Texas and the third in Pennsylvania. They assert that the dangers posed by the ongoing pandemic render the conditions of their confinement at the FRCs a violation of their due-process rights under the Fifth Amendment. Specifically, Petitioners argue that Immigration and Customs Enforcement has failed to effectively implement basic protective measures such as masking and social distancing.

At the outset of this litigation, Petitioners' central focus was on securing improvements in such conditions; now, they seek wholesale release from ICE confinement, and they urge this Court to grant a preliminary injunction to that effect. In parallel proceedings, another federal court — applying a longstanding consent decree, not the Due Process Clause — recently ordered the release of all <u>minors</u> who have been detained at an FRC for longer than twenty days. <u>See</u>

1

Flores v. Barr, No. 85-4544, 2020 WL 3488040, at *1–2 (C.D. Cal. June 26, 2020).  Many Petitioners are minors who qualify.  As a practical matter, then, Petitioners' request for release pertains principally to the adults among them.

The Preliminary Injunction Motion presents difficult legal questions and turns on disputed factual allegations about what is actually taking place inside the FRCs.  At this point, however, the Court need not untangle those knots.  Even assuming the conditions of Petitioners' confinement violate their due-process rights, they have not yet clearly shown that they are entitled to the extraordinary remedy of blanket release from immigration detention.  The Court will accordingly deny their Motion.

## I.   Background

### A.   Family Residential Centers

Petitioners number over 200 of the 300-plus noncitizen parents and children who are currently detained in the three ICE FRCs: the Berks County Residential Center in Leesport, Pennsylvania (Berks); the South Texas Family Residential Center in Dilley, Texas (Dilley); and the Karnes County Family Residential Center in Karnes City, Texas (Karnes).  See ECF No. 1 (Mandamus Pet.), ¶ 2.  Each facility exclusively holds migrant families, and each ordinarily operates as a congregate-care facility with communal sleeping quarters, bathrooms, dining rooms, and recreational areas.  See ECF No. 1-2 (Declaration of Bridget Cambria), ¶¶ 14–15; ECF No. 1-4 (Declaration of Shalyn Fluharty), ¶¶ 6, 12–13; ECF No. 1-7 (Declaration of Andrea Meza), ¶¶ 7, 35.  Dilley and Karnes can hold 2,400 and 830 individuals, respectively.  See ECF No. 39-2 (Declaration of Michael Sheridan), ¶¶ 7, 31.  Berks is a much smaller facility, able to house only 96.  See ECF No. 39-3 (Declaration of Christopher George), ¶ 4.

Detainees at the Berks, Dilley, and Karnes FRCs fall into three basic categories regarding their immigration status.  As of late April, more than half were subject to final orders of removal and were awaiting removal, <u>see</u> ECF No. 51-1 (April 22 Supplemental Declaration of Melissa B. Harper), ¶ 5, although some such orders are subject to judicial or administrative stays.  <u>See</u> ECF No. 51-3 (April 22 Declaration of Christopher George), ¶ 50; ECF No. 78-9 (Supplemental Declaration of Shalyn Fluharty), ¶ 17.  About a third of detainees had been processed for expedited removal and were undergoing credible- or reasonable-fear determinations to determine their eligibility for asylum.  <u>See</u> Apr. 22 Harper Suppl. Decl., ¶ 5.  The remaining few were pending formal removal proceedings under section 240 of the INA.  <u>Id.</u>  These numbers may well have shifted some in the past few months, as the detainee population is constantly in flux.  <u>See, e.g.</u>, ECF No. 94-1 (July 20 Supplemental Declaration of Melissa B. Harper), ¶¶ 4–6 (reporting intake of 262 new detainees and release of 145 detainees from July 1 to July 20, 2020).

   B.   <u>This Litigation</u>

In March of this year, communities across the United States began to experience outbreaks of an infectious disease known as COVID-19, caused by a novel coronavirus known as SARS-CoV-2.  <u>See</u> ECF No. 1-12 (Declaration of Dr. Ronald Jay Waldman), ¶ 4.  The Centers for Disease Control and Prevention reports that COVID-19 is spread mainly via close contact between persons and through respiratory droplets produced when an infected person talks, coughs, or sneezes.  <u>See</u> CDC, Coronavirus Disease 2019 (COVID-19), Protect Yourself, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited July 19, 2020).  Infected persons are likely capable of spreading the disease despite showing no symptoms.  <u>Id.</u>  It does not take a medical degree to recognize that congregate detention facilities

like FRCs "are difficult environments in which to prevent the spread of a dangerous contagion like COVID-19." C.G.B. v. Wolf, No. 20-1072, 2020 WL 2935111, at *2 (D.D.C. June 2, 2020).

On March 21, 2020, understandably fearful of the arrival of the virus at their facilities, Petitioners filed this action challenging the conditions of their confinement.  That same day, they sought a Temporary Restraining Order compelling ICE to implement COVID-19 safety protocols at the FRCs and, if preventive measures were not possible, to release them from detention.  See ECF No. 4 (TRO Mot.) at 1, 29.  On March 30, after a telephonic hearing, the Court granted in part and denied in part the Motion, declining to order release but requiring ICE to implement protocols consistent with CDC guidance for congregate detention facilities.  See Min. Order (Mar. 30, 2020).  Believing these measures insufficient, Petitioners now seek a preliminary injunction ordering their release.  See ECF No. 78 (PI Mot.).

C.  Other Relevant Cases

The instant action, perhaps not surprisingly, is not the only one covering FRC detainees. Judge Dolly M. Gee of the U.S. District Court for the Central District of California oversees a class action that long ago resulted in a consent decree, known as the Flores Settlement Agreement (FSA), providing certain rights to all minors detained at FRCs.  See Flores v. Barr, No. 85-4544, 2020 WL 2128663 (C.D. Cal. Mar. 28, 2020).  Specifically, the FSA provides that minors shall be held "in facilities that are safe and sanitary," FSA, ¶ 12.A, and that "[w]here [the government] determines that the detention of the minor is not required either to secure his or her timely appearance [in immigration proceedings], or to ensure the minor's safety or that of others, the [government] shall release a minor from its custody without unnecessary delay."  FSA, ¶ 14. In March of this year, the Flores plaintiffs argued to Judge Gee that ICE's pandemic response at the FRCs was in breach of its contractual obligations to release minors "without unnecessary

4

delay" and to provide "safe and sanitary" conditions.  See Flores, 2020 WL 2128663, at *3.  The plaintiffs sought a TRO ordering the prompt release of most minors and requiring ICE to implement public-health strategies recommended by the CDC for congregate detention facilities. Id.

On March 28, Judge Gee granted the motion in part and denied it in part.  She found that although ICE had been "laggardly in its early response" to the COVID-19 threat, it had begun implementing CDC guidance for detention facilities.  Id. at *6.  She ordered ICE to report to a court-appointed Monitor on its current capacity and the status of its compliance with CDC recommendations.  Id. at * 9.  She declined, however, to order any minor's release by a date certain, instead ordering ICE to "make every effort to promptly and safely release" minors.  Id. at *10; see also Flores v. Barr, No 85-4544, 2020 WL 2758792, at *12–14 (C.D. Cal. Apr. 24, 2020); id., 2020 WL 2758795, at *2 (C.D. Cal. May 22, 2020).

On June 26, however, Judge Gee changed course.  She stated that she "appreciate[d] . . . ICE's . . . efforts," which are described below, "to reduce the number of [minors] in [its] custody during the pandemic."  Id., 2020 WL 3488040, at *1 (C.D. Cal. June 26, 2020).  But Judge Gee noted that, according to the plaintiffs and the Independent Monitor, ICE had "fail[ed] to implement best public health practices."  Id. at *2.  She specifically cited the Monitor's "observations of non-compliance or spotty compliance with masking and social distancing rules."  Id.  Based on those observations, the court decided that ICE's adherence to its contractual obligations — namely, to provide "safe and sanitary" conditions and to release minors "without unnecessary delay" — "remain[ed] at issue."  Id.  Given those concerns and "the severity of the outbreak [of COVID-19] in the counties in which FRCs are located," Judge Gee ordered ICE to release to a suitable sponsor all minors who have been detained longer than

5

twenty days.  Id. at *2–3.  Judge Gee initially set a deadline of July 17, but that deadline has been extended by stipulation to July 27.  See ECF No. 91 (Notification of Stipulation to Extend).  She also ordered ICE to "urgently enforce its existing COVID-19 protocols, particularly" in the areas of social distancing, masking, and testing.  Flores, 2020 WL 3488040, at *3.

This decision has significant ramifications for the suit before this Court, which deals with both FSA-covered minors and their non-covered parents (as well as some non-covered minors), given that close to half of Petitioners may soon be released regardless of anything this Court does.  Judge Gee's order also has serious consequences for parent Petitioners.  The order recognizes that a child's parent(s) may choose not to have the child released from detention — e.g., if a suitable guardian is not available — in effect waiving the child's rights under the FSA. Id. at *2, *3.  Absent a further order requiring the release of adult detainees from the FRCs, then, parents face a difficult choice: release their children to sponsors for an unknown amount of time, or keep their children with them in conditions that Petitioners fear are dangerous.

Two other ongoing litigations also bear mention.  First, although roughly half of FRC detainees are subject to final orders of removal, many of those detainees (some likely Petitioners here) are currently seeking a stay of those orders in another suit in front of Judge Christopher R. Cooper of this district.  See Mot. for a TRO and Stay of Removal, D.A.M. v. Barr, No. 20-1321 (D.D.C. filed May 18, 2020).  The plaintiffs in that action contend that the government is failing to adequately protect them from contracting COVID-19 during the removal process.  Id.  If Judge Cooper sides with them, such an order would forestall the removal of many Petitioners for at least some period.

Second, in Fraihat v. ICE, No. 19-1546, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020), Judge Jesus Bernal of the U.S. District Court for the Central District of California has

provisionally certified two nationwide subclasses, consisting of all ICE detainees with risk factors or disabilities putting them in danger of severe illness or death from COVID-19. <u>Id.</u> at *20. He held that such high-risk detainees were likely to succeed on the merits of their claims of medical indifference and unconstitutional conditions of confinement. <u>Id.</u> at *22, *25. Judge Bernal thus granted a preliminary injunction ordering ICE to identify all detainees at heightened risk from COVID-19 and to promptly make individualized custody determinations for all of them. <u>Id.</u> at *29. The Government represents that some Petitioners here may be members of one of the <u>Fraihat</u> subclasses. <u>See</u> ECF No. 58-1 (Resp't Mot. to Dismiss) at 30.

    D. <u>ICE's Response to COVID-19 at FRCs</u>

       1. *Undisputed Facts*

    Over the past four months, ICE has taken steps (prompted, perhaps, by the court orders discussed above) to reduce the risk of a COVID-19 outbreak at the Berks, Dilley, and Karnes facilities. As Judge Gee noted, the agency has released many detainees from the FRCs. <u>See</u> <u>Flores</u>, 2020 WL 3488040, at *1 & n.1; <u>compare</u> Sheridan Decl., ¶¶ 7, 31 (reporting 609 detainees at Dilley and 433 at Karnes as of April 3), <u>with</u> July 20 Harper Suppl. Decl., ¶ 4 (reporting 172 at Dilley and 153 at Karnes as of July 20). The number of residents at Berks has increased from sixteen to twenty-one. <u>Compare</u> ECF No. 82-1 (Supplemental Declaration of Christopher George), ¶ 17, <u>with</u> July 20 Harper Suppl. Decl., ¶ 4.c. Based on these numbers, Dilley and Karnes have reduced their detainee populations by roughly two-thirds since early April. As to total facility capacity, Berks is now at 21%, Dilley is at 7%, and Karnes is at 18%. The population may well decrease further soon, as half of current detainees are minors entitled to release under Judge Gee's order. <u>See</u> July 20 Harper Suppl. Decl., ¶ 4. Of course, the fact that

many other detainees have been released is cold comfort to Petitioners, who continue to be held against their will.

In addition to stepping up release of detainees, ICE has adopted other protective measures. According to declarations submitted by ICE officials and undisputed by Petitioners, it appears that the agency has implemented and now consistently abides by the following protocols:

- Staff receive temperature checks and are screened for COVID-19 symptoms prior to beginning their shift. See George Suppl. Decl., ¶¶ 26–27; ECF No. 82-2 (Declaration of Richard M. Hunt), ¶ 9; ECF No. 82-3 (Declaration of Anthony S. Hofbauer), ¶ 6; Sheridan Decl., ¶ 48; ECF No. 78-3 (Independent Monitor Report) at 5.

- If a staff member tests positive for COVID-19, he or she is placed on leave for at least fourteen days, and medical clearance (*i.e.*, a doctor's note and negative test) is required to return to work. See George Suppl. Decl., ¶ 28; Hunt Decl., ¶ 6; Hofbauer Decl., ¶ 11.

- ICE conducts contact tracing, including by reviewing video, to determine whether a COVID-positive employee has been in close contact with any detainee or other staff. Potentially exposed detainees or staff are treated consistent with CDC guidelines including isolation and monitoring. See George Suppl. Decl., ¶ 28; Hunt Decl., ¶¶ 7, 10; Fluharty Suppl. Decl., ¶ 9; Hofbauer Decl., ¶¶ 5, 7–9.

- All incoming detainees are tested (upon consent) for COVID-19 and placed in a cohort away from the rest of the detainee population for fourteen days. The same cohorting and quarantining procedures apply to any detainee who leaves the facility for offsite appointments, such as for health care. See George Suppl. Decl., ¶¶ 29–33, 36; Hunt Decl., ¶¶ 3, 9; Hofbauer Decl., ¶¶ 4, 5.d–e; Independent Monitor Report at 5.

- Each FRC now has one family per sleeping quarters to maximize social distancing. See George Suppl. Decl., ¶¶ 16–17; Hunt Decl., ¶ 9; Sheridan Decl., ¶ 31; Hofbauer Decl., ¶ 12.c.

- Common spaces are disinfected more frequently and more intensely than before the pandemic began. ICE has increased the number of hand-sanitizing stations and wipes. See Apr. 22 George Decl., ¶¶ 16–20, 35; George Suppl. Decl., ¶ 51; Sheridan Decl., ¶¶ 17, 40; Hunt Decl., ¶ 9.

- ICE has suspended in-person visitation, facility tours, and non-essential civilian access. See George Decl., ¶ 17.d–h; Sheridan Decl., ¶¶ 19, 23, 42, 46.

- At Dilley and Karnes, ICE screens arrivals to determine whether they qualify as high-risk under Fraihat, 2020 WL 1932570. Consistent with Judge Bernal's order, all cases involving risk factors are evaluated for possible release. See Hunt Decl., ¶ 8; Hofbauer Decl., ¶ 12.a. Until very recently, only one new family has arrived at Berks since March,

<u>see</u> George Suppl. Decl., ¶¶ 16–18, and it is unclear whether that family's three members were similarly screened.

2. *Disputed Facts*

Although Petitioners do not appear to dispute ICE's compliance with the above protocols, they assert — echoing Judge Gee's June 26 order — that the agency nonetheless continues to fall short of implementing "basic protective measures like social distancing, personal protective equipment, medical care, and testing." <u>See</u> ECF No. 85 (PI Reply) at 2; PI Mot. at 10–13. Whereas the Government's submissions regarding such matters "relate at most to policy," Petitioners claim, they "do not accurately reflect what happens in practice." PI Reply at 4.

Since the start of this case, Petitioners have repeatedly submitted declarations and summaries describing the alleged insufficiency of the FRCs' pandemic response. <u>E.g.</u>, ECF No. 44 (Pet'rs' Response to April 6 Status Report) at 6–8; ECF No. 52 (Pet'rs' Response to April 22 Status Report) at 11–13. Petitioners' preliminary-injunction papers, however, do not state clearly whether many of the previously reported deficiencies persist. <u>See</u> PI Mot. at 11–12. To assess the state of play at the FRCs, the Court therefore largely relies on Petitioners' and Respondents' most recent declarations and the report from the <u>Flores</u> Independent Monitor (which covers Dilley and Karnes).

a. Mask Use

Begin with masks. It is undisputed that staff at all three FRCs are required to wear face coverings at all times. <u>See</u> George Suppl. Decl., ¶ 43; Hunt Decl., ¶ 9; Hofbauer Decl., ¶¶ 6, 12.f. It is also undisputed that detainees are issued masks and are required to wear them (except while eating) outside their sleeping area. <u>See</u> George Suppl. Decl., ¶¶ 43–46; Hunt Decl., ¶ 9; Hofbauer Decl., ¶ 12.c–d. The <u>Flores</u> Independent Monitor reported in late June that "[t]he

stated policy is for all staff and detainees to wear a mask at all times (except while eating)."
Independent Monitor Report at 5.

The Monitor, however, went on to note that "video for Dilley revealed only partial compliance with masking requirements among staff." Id. at 5–6. The Monitor also conducted "[i]nterviews with . . . detained women," which "confirmed that masking among staff is only intermittently enforced." Id. at 6. Recent declarations submitted by attorneys on the ground at the FRCs make the same assertion, albeit in general terms. See Fluharty Suppl. Decl., ¶ 4 ("Little has changed at [Dilley.] The inconsistent use of personal protective equipment . . . continues."); ECF No. 78-10 (Supplemental Declaration of Andrea Meza), ¶ 8 (noting that her Karnes clients "indicate that . . . staff continue to irregularly adhere to CDC guidelines including those regarding the use of PPE").

In addition to these concerning reports, Petitioners provide several more specific claims regarding inadequate mask usage. For instance, one Dilley detainee observed both staff and residents frequently "pull[] their masks down because of the afternoon heat" during a recent Fourth of July celebration. See ECF No. 85-1 (Declaration of D.A.M.), ¶ 11. In addition, detainees at Berks are issued masks only once a week and have allegedly not been told of ICE's policy to provide additional masks if asked. See ECF No. 78-4 (June 17 Declaration of Bridget Cambria), ¶ 29. Finally, it seems that older children at Berks may not consistently wear masks (all agree that children younger than two cannot wear masks due to the risk of suffocation). Id., ¶¶ 23, 27, 36.

### b. Social Distancing

There is also some dispute as to the current state of social distancing at the FRCs. ICE officials maintain that such practice is observed at all three facilities. See George Suppl. Decl.,

¶¶ 38–42; Hunt Decl., ¶¶ 5, 9; Sheridan Decl., ¶¶ 25, 49.  Petitioners, however, assert that

compliance remains inconsistent.  See ECF No. 78-8 (July 2 Declaration of Bridget Cambria),

¶ 19; Fluharty Suppl. Decl., ¶¶ 4, 6, 18; Meza Suppl. Decl., ¶¶ 8, 9.  The Independent Monitor's

report noted that videos of Karnes and Dilley "showed appropriate distancing among staff and

detainees."  Independent Monitor Report at 6.

  The exception, according to the Monitor, was that all nine interviewed detainees

"reported that distancing was not practiced in the common dining room," as six to eight "persons

of different families were seated at each table without distancing during meals."  Id.  It is not

clear whether this mid-June finding pertains to both Dilley and Karnes, or instead only Dilley.

One of Petitioners' recent declarations, however, notes that as of "June 30, 2020, families [at

Dilley] report no longer sharing tables in the dining hall and being instructed to move away from

each other if congregating in groups to speak outside."  Fluharty Suppl. Decl., ¶ 5.  And

declarations of ICE officials dating back to April maintain that since the pandemic began, meals

at Karnes are provided to detainees in their rooms, not in the dining rooms.  See Sheridan Decl.,

¶ 49.b; ECF No. 51-2 (April 22 Declaration of Michael Sheridan), ¶ 19.a.v.  Petitioners have not

contested that point, nor do they dispute that at Berks, entry into the dining hall is now staggered,

with each family sitting at their own table.  See George Suppl. Decl., ¶¶ 39–40.

  Petitioners nonetheless flag several ways in which sound distancing practices may not yet

be a reality at the FRCs.  First, they note that children cannot be expected to effectively distance

and thus pose a distinct risk of spreading the virus among detainees.  See June 17 Cambria Decl.,

¶¶ 23, 36.  That concern is well founded, as several children from different families at Berks

suffered the same non-COVID viral illness earlier this year.  Id., ¶¶ 31–32.  Second and

relatedly, Petitioners report that at Dilley, "the gym continues to be used by large groups of

people, including groups of mothers who sit together with . . . staff while large groups of children play together." Fluharty Suppl. Decl., ¶ 6.  Third, a Dilley detainee reports that the facility held an ill-advised Fourth of July celebration, involving games like tug-of-war, at which detainees sometimes interacted in large groups despite nominal social-distancing attempts.  See D.A.M. Decl., ¶¶ 2–10, 17.

              c.   Detainee Education and Medical Care

Petitioners' final two areas of concern are COVID education and COVID-related medical care for the FRC detainees.  On the former, the record contains directly contradictory assertions. ICE officials claim to have provided detainees education on preventive measures such as proper use of PPE and effective distancing.  See George Suppl. Decl., ¶¶ 39, 45; Hunt Decl., ¶ 9; Sheridan Decl., ¶ 41; Hofbauer Decl., ¶ 12.b.  Petitioners rejoin that ICE has failed to provide sufficient education regarding the virus at Dilley and Berks.  See July 2 Cambria Decl., ¶ 10; Fluharty Suppl. Decl., ¶ 4.

As to medical care, Petitioners cite many incidents in which FRC detainees allegedly received inadequate care for conditions other than COVID-19.  See PI Mot. at 12; ECF No. 78-6 at ECF p. 11 (Letter to Independent Monitor and Independent Medical Expert) at 2–13; Cambria Suppl. Decl., ¶ 13.  Petitioners also claim to have documented ICE's lack of "medical preparedness" for a COVID-19 outbreak.  See PI Mot. at 11.  ICE's ability to care for detainees who become seriously ill from the coronavirus is obviously a matter of paramount importance. As of right now, however, the Court must defer to the findings of the Independent Monitor, who reported to Judge Gee that:

> [w]hile there are isolated complaints that merit further investigation, the descriptions of the medical system for children in these two facilities seems adequate. Medical personnel are present in the facility at all times and advanced practice clinicians (physician assistants or nurse practitioners) during daytime

> hours. Pediatricians hold clinical sessions several days each week and are available
> on call. Acute or complicated patient needs are addressed through referral to the
> children's hospital in San Antonio or a local health facility. The quality of these
> services, however, could not be addressed given the time and procedural constraints
> of this assessment, and will be addressed in a future report.

Independent Monitor Report at 4–5.  Although this tentative report concerned only medical care

for children, Petitioners offer no specific reason why the FRCs' medical capabilities are not

roughly equivalent for the adult population.

    E.  Current Situation at FRCs

       For the moment, ICE's efforts at preventing COVID-19 outbreaks at the FRCs —

whatever one thinks of them — seem to have yielded a moderate, though undeniably fragile,

success.  In late June, the agency tested every member of the FRC detainee population, see

George Suppl. Decl., ¶ 19; Hunt Decl., ¶ 9; Independent Monitor Report at 7, and, as noted, ICE

tests every new arrival.  No detainee at Berks has tested positive for COVID-19.  See George

Suppl. Decl., ¶ 19.  Until July 20, none had tested positive at Dilley either, see Hunt Decl., ¶ 9;

however, Dilley recently had its first positive detainee, a new intake who was quarantined and

tested upon arrival and thus appears unlikely to have contracted the disease at the facility.  See

ECF No. 95 (July 20 Notice of Positive Cases) at 2.  The situation is more alarming at Karnes,

where by the Court's count there have been 41 positive detainees.  See Hofbauer Decl., ¶ 5; ECF

No. 86 (July 12 Notice of Positive Cases); ECF No. 90 (July 15 Notice of Positive Cases); July

20 Notice of Positive Cases.  Again though, all but one of those cases have been new intakes

whose tests came back positive while the detainees were in their initial 14-day quarantine.  See

July 20 Notice of Positive Cases (describing detainee whose initial late June test was negative,

but who was tested again prior to deportation and tested positive).

The current status quo at the FRCs thus offers reasonably good news.  But, as the country has learned over the past few months, anything related to COVID-19 can change quickly, and there remains significant cause for concern about the FRCs in particular.  Although Berks has had no employee positives, Karnes and Dilley have had over a dozen each, and counting.  See Hofbauer Decl., ¶ 5; ECF No. 82 (PI Opp.) at 3; July 12 Notice of Positive Cases; July 15 Notice of Positive Cases.  And the communities surrounding the FRCs, particularly the Texas counties housing Dilley and Karnes, are currently experiencing significant COVID outbreaks.  See Independent Monitor Report at 6–7 ("The recent trends in this regard are worrisome.").

* * *

In sum, it seems fair to say that ICE has taken many steps to prevent the spread of COVID-19 at the three FRCs, including releasing two-thirds of detainees and adopting CDC guidance regarding screening, cohorting, frequent disinfecting, masking, and social distancing.  It also seems fair to say that the agency, while likely trending in the right direction, continues to fall short of full compliance with its policies in practice.  Those shortcomings, according to Petitioners, remain pronounced.  So pronounced, in fact, that Petitioners argue that any continued detention violates their due-process rights under the Fifth Amendment, such that they are entitled to court-ordered release.  Whether they are right is what the Court must now decide.

## II.    Legal Standards

"[I]njunctive relief" is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  The moving party bears the burden to make the required "clear showing" that the requested relief is warranted.  Hospitality Staffing Solutions, LLC v. Reyes, 737 F. Supp. 2d 192, 197 (D.D.C. 2010).  "A plaintiff seeking a preliminary injunction must establish [1] that he

is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter, 555 U.S. at 20.  Where the Government is the defendant, the balance-of-equities and public-interest factors merge.  See Pursuing America's Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016).  Before the Supreme Court's decision in Winter, courts weighed the preliminary-injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another.  See, e.g., Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360–61 (D.C. Cir. 1999). This Circuit, however, has suggested, without deciding, that Winter should be read to abandon the sliding-scale analysis in favor of requiring courts to "treat the four [here, three] factors as independent requirements."  See Sherley v. Sebelius, 644 F.3d 388, 392–93 (D.C. Cir. 2011).

## III.    Analysis

In light of the disputed facts detailed above, the Court finds it difficult to conclusively determine whether Petitioners have established a likelihood of success on the merits of their claim that the conditions of their confinement at the FRCs violate their due-process rights.  The Court, however, concludes that it ultimately need not answer that question, nor decide whether Petitioners will likely be irreparably harmed.  Even assuming that they will suffer irreparable constitutional violations in the absence of some relief, they have not met their burden to clearly demonstrate that nothing short of wholesale release — the only remedy Petitioners seek at this point — can redress their injuries.

Where a plaintiff seeks an injunction aimed at redressing unconstitutional conditions of confinement, the court-ordered remedy must be "specifically tailored to address the violations the court has identified."  Women Prisoners of D.C. Dep't of Corr. v. Dist. of Columbia, 93 F.3d

15

910, 929 (D.C. Cir. 1996).  "[T]he task of the court is to remedy the offending conditions" by "mandating specific corrections of specific problems," not by immediately adopting a "global remedy."  Inmates of Occoquan v. Barry, 844 F.2d 828, 841 (D.C. Cir. 1988).  The "global remedy" of wholesale release from detention, of course, "is the most intrusive measure" the Court could possibly order.  See C.G.B., 2020 WL 2935111, at *28.

To secure a preliminary injunction ordering their release, therefore, immigration detainees such as Petitioners must "show that such incursion is necessary to redress the complained-of violations."  Id. (emphasis added).  Put differently, Petitioners bear the burden to demonstrate that no remedy short of release will cure their constitutional injuries.  Id.  Courts in this district and around the country have repeatedly held as much during the COVID-19 pandemic.  See Urdaneta v. Keeton, No. 20-654, 2020 WL 2319980, at *12 (D. Ariz. May 11, 2020) (denying release because "Court [was] unable to conclude that there is no set of conditions short of release that would be sufficient to protect Petitioner's constitutional rights"); Toure v. Hott, No. 20-395, 2020 WL 2092639, at *9 (E.D. Va. Apr. 29, 2020) ("[W]hile Plaintiffs have pled and argued that release is the only remedy that could cure the harm they complain of, they have not shown that to be the case."); Jones v. Wolf, No. 20-361, 2020 WL 1643857, at *14 (W.D.N.Y. Apr. 2, 2020) (denying habeas relief because "Court [was] not convinced that the unconstitutional conditions at [an ICE detention facility] cannot be remedied through an injunction"); Dawson v. Asher, No. 20-409, 2020 WL 1304557, at *2 (W.D. Wash. Mar. 19, 2020) ("[E]ven if Plaintiffs could show a Fifth Amendment violation, Plaintiffs provide no authority under which such a violation would justify immediate release, as opposed to injunctive relief that would leave Plaintiffs detained while ameliorating any alleged violative conditions within the facility."); see also United States v. Otunyo, No. 18-251, 2020 WL 2065041, at *13

16

(D.D.C. Apr. 28, 2020) (denying release of criminal pretrial detainee because "[u]nconstitutional conditions of confinement can typically be remedied without resorting to the release of a defendant"); Banks v. Booth, No. 20-849, 2020 WL 1914896, at *15 (D.D.C. Apr. 19, 2020) (finding inmate plaintiffs "entitled to . . . injunctive relief" aimed at improving conditions in response to COVID-19, but concluding that "the immediate release of inmates . . . is inappropriate at this time"); Banks v. Booth, No. 20-849, 2020 WL 3303006, at *18 (D.D.C. June 18, 2020) (same).

As an analytical matter, it is not entirely clear where in the preliminary-injunction framework this question of release belongs. Some courts consider it as related to likelihood of success on the merits, others believe it concerns the public interest, and still others apparently conceive of it as a separate remedy question divorced from the four-factor test. See C.G.B., 2020 WL 2953111, at *28 (stating that if "the Court has a less intrusive means of" protecting the plaintiff's rights, then "the public interest would weigh towards choosing such options") (emphasis added) (quoting Garnett v. Zeilinger, 313 F. Supp. 3d 147, 160 (D.D.C. 2018)); Dawson, 2020 WL 1304557, at *2 (framing the inquiry as whether plaintiffs were likely to succeed); Toure, 2020 WL 2092639, at *9 (same); Banks, 2020 WL 1914896, at *15 (addressing this question after concluding that all four injunction factors were met). The lack of doctrinal uniformity notwithstanding, the caselaw is clear that to be entitled to an injunction ordering their release, Petitioners must demonstrate that "release is the only remedy that could cure the harm they complain of." Toure, 2020 WL 2092639, at *9.

This section thus proceeds as follows. It first sets out the standard for conditions-of-confinement claims and then considers whether current conditions at the FRCs violate Petitioners' due-process rights. The closeness of that question informs the Court's inquiry, to

17

which this section then turns, into whether release is demonstrably necessary to remedy the alleged violation of Petitioners' rights.

    A.  Conditions-of-Confinement Claim

Because Petitioners are civil immigration detainees and have not been convicted of any crime, the Due Process Clause "requires that [they] not be punished." Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979). "[T]he proper inquiry" when evaluating the constitutionality of conditions of civil detention, therefore, "is whether those conditions amount to punishment of the detainee." Id. at 535. A detainee can establish unconstitutional punishment in two ways: 1) by showing that "the disability is imposed for the purpose of punishment"; or 2) by showing that the challenged condition is either not "reasonably related to a legitimate goal" or "appears excessive in relation to" that purpose. Id. at 538–39; see also Kingsley v. Hendrickson, 576 U.S. 389, 398 (2015).

Petitioners make no claim that ICE detains them with the intent of punishing them. It is well established, moreover, that the Government has a legitimate interest in the enforcement of immigration laws, and that such interest is furthered by detaining certain noncitizens. See Demore v. Kim, 538 U.S. 510, 523 (2003) ("[T]his Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process."); C.G.B., 2020 WL 293511, at *23. As the Supreme Court put it in Jennings v. Rodriguez, 138 S. Ct. 830 (2018), "Detention during [immigration] proceedings gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made." Id. at 836. Petitioners' claims therefore turn on whether their detention in current FRC conditions is either "objectively unreasonable" or "excessive in relation" to those objectives. See C.G.B., 2020 WL 293511, at

*22 n.31, *23 (citing Kingsley, 576 U.S. at 397–98); Banks, 2020 WL 1914896, at *6; United States v. Moore, No. 18-198, 2019 WL 2569659, at *2 (D.D.C. June 21, 2019).

The Supreme Court has held that civil detainees also have a due-process right to be detained in an environment of "reasonable safety."  See Deshaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189, 200 (1989); Youngsberg v. Romeo, 457 U.S. 307, 216 (1982) ("[I]t must be unconstitutional to confine the involuntarily committed . . . in unsafe conditions."); see also Dawson v. Asher, No. 20-409, 2020 WL 1704324, at *10 (W.D. Wash. Apr. 8, 2020).  The Court agrees with Judge Cooper and other federal district judges around the country, however, that the government's obligation to provide "reasonable safety" does not "require that detention facilities reduce the risk of harm to zero" during the COVID-19 pandemic.  See C.G.B., 2020 WL 2935111, at *23 (quoting Benavides v. Gartland, No. 20-46, 2020 WL 1914916, at *5 (S.D. Ga. Apr. 18, 2020)); see also Dawson, 2020 WL 1704324, at *12.

    B.  Likelihood of Success

Applying these principles, whether Petitioners' conditions of confinement likely violate the Due Process Clause is a close question.  Petitioners begin by contending that Judge Gee has already found conditions at the three FRCs to be unsafe, and that such finding should be enough to establish a likely violation of their due-process rights.  See PI Mot. at 9–10.  The Court is skeptical, however, that Judge Gee's June 26 order can bear the weight Petitioners place on it.  For one thing, that order was based on conditions as of three weeks ago, some of which appear to have changed for the better.  Compare Independent Monitor Report at 6 (reporting lack of social distancing during meals at Dilley) with Fluharty Suppl. Decl., ¶ 5 (Petitioners' declaration stating that as of "June 30, 2020, families [at Dilley] report no longer sharing tables in the dining

hall and being instructed to move away from each other if congregating in groups to speak outside").

More significant, although Judge Gee found that ICE's compliance with its paragraph-12 obligation to provide "safe and sanitary" conditions remained "at issue," Flores, 2020 WL 3488040, at *2, her release order rested largely on minors' rights under paragraph 14 of the FSA to release without unnecessary delay.  Specifically, Judge Gee appears to have determined that detaining any minors longer than twenty days during the COVID-19 pandemic is "unnecessary" within the meaning of the FSA.  She had previously interpreted the term "unnecessary delay" to impose only a presumptive maximum detention time of twenty days.  See Flores v. Sessions, 394 F. Supp. 3d 1041, 1070 (C.D. Cal. 2017).  And in her most recent order, she did not order the release of all minor detainees, but only those "who have resided at the FRCs for more than 20 days."  Flores, 2020 WL 3488040, at *3.  Had Judge Gee's June 26 order rested mainly on a determination that release was necessary to protect minors from "unsafe conditions" in violation of paragraph 12, she presumably would have extended relief to all detained minors.

In any event, the Court doubts that the FSA's contractual standard of "safe and sanitary" is equivalent to the constitutional standard of "reasonable safety" under Deshaney.  After all, "due process is a 'flexible' concept that 'calls for such protections as the particular situation demands."  C.G.B., 2020 WL 2935111, at *17 (quoting Jennings, 138 S. Ct. at 852).  The Court's "reasonable safety" inquiry, like the "objectively reasonable" inquiry required by Kingsley, therefore also ought to account for the Government's interest in the claimant's detention.  Id. at *24 ("In sum, due process requires evaluation of conditions of confinement on a sliding scale."); Kingsley, 576 U.S. at 398–99.  No such balancing is called for in holding the Government to its contractual obligation to provide "safe" conditions under the FSA.

Beyond relying on Judge Gee's order, Petitioners do not provide a clear benchmark for evaluating whether their detention is excessive or objectively unreasonable in relation to the Government's legitimate interests.  At times, they suggest that "even good compliance with CDC guidance will not likely be sufficient to fully protect minors and their families from Covid-19 while in ICE detention."  PI Mot. at 11 (quoting Independent Monitor Report at 2); PI Reply at 4 (same) (alteration omitted); see also id. at 16 ("[T]his Court cannot put an end to the COVID-19 pandemic or change the fact that the FRCs are congregate detention facilities.").  Elsewhere, though, Petitioners home in on ICE's alleged "demonstrated inability . . . to implement even the basics of its chosen protective measures."  PI Reply at 2–3.  Even there, Petitioners concede that the Constitution does not demand "perfect" compliance with those measures, id. at 2, rendering the key questions ones of degree — legally, how close to perfect compliance must ICE get, and factually, how close have they gotten?

While acknowledging that it might sound like a broken record, the Court finds these questions difficult to answer.  At this point, ICE's performance seems to be somewhere between "room for improvement" and "reasonably successful," but plenty of daylight — and likely the constitutional line — lies between those two answers.  As discussed above, ICE has implemented many COVID-prevention measures, including greatly reducing the detainee population.  At Berks and Dilley (the largest of the three FRCs), only one detainee has tested positive, and that detainee was positive upon arrival.  See George Suppl. Decl., ¶ 19; Hunt Decl., ¶ 10; July 20 Notice of Positive Cases at 2.  At Karnes, there have been positives, but so far only one confirmed case of transmission within the resident population.  See Hofbauer Decl., ¶ 5; July 12 Notice of Positive Cases; July 15 Notice of Positive Cases; ECF No. 93 (July 18 Notice of Positive Cases); July 20 Notice of Positive Cases at 1.

Still, the situation is dynamic and there remain legitimate reasons to worry.  COVID

cases are spiking in the counties around Karnes and Dilley, see Independent Monitor Report at

6–7, and, unsurprisingly, an escalating number of employees at those FRCs are testing positive.

See July 12 Notice of Positive Cases; July 15 Notice of Positive Cases; July 18 Notice of

Positive Cases; July 20 Notice of Positive Cases.  The Court would indeed be foolish to try to

predict future positivity rates.  The record, moreover, contains some evidence of noncompliance

with established ICE policies.  Mask wearing, a crucial measure for decreasing coronavirus

transmission, seems to remain inconsistent.  See CDC, Considerations for Wearing Cloth Face

Coverings, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-

guidance.html (last visited July 21, 2020).  And the Fourth of July event at Dilley, while an

isolated incident, suggests a troubling lack of concern and judgment among ICE officials when it

comes to the risks posed by flouting the CDC's protocols.

The Court need not dive more deeply into these matters now.  At a minimum, Petitioners

have not demonstrated an obvious violation of their due-process rights.  As explained below,

even assuming current conditions do cross the line into unconstitutional territory, Petitioners

have failed to make the necessary showing that no remedy short of wholesale release will redress

their injuries.

C.  Necessity of Release

Attempting to demonstrate the necessity of their release, Petitioners first argue that given

ICE's purported "track record of continually deficient actions and apathy toward detainees'

safety," merely ordering the agency to take remedial steps short of releasing all detainees would

qualify as insanity under the apocryphal definition: "doing the same thing over and over yet

expect[ing] different results."  PI Reply at 11; see also PI Mot. at 16 ("[O]ne cannot reasonably

expect [ICE] will adequately implement any alternative remedial order.").  Even assuming ICE

has yet to implement a constitutionally satisfactory level of COVID precautions, though, the

record evidence does not clearly support a finding that it has been incorrigible.  On the contrary,

ICE has adopted many prevention policies since March, most of which it seems to have

substantially implemented in practice.  Aside from the concerning Fourth of July incident,

moreover, Petitioners offer no more than general assertions that "[l]ittle has changed" since

Judge Gee's order.  See Fluharty Suppl. Decl., ¶ 4 (Dilley); Meza Suppl. Decl., ¶ 9 ("There is no

indication of improved safety conditions at Karnes . . . .").  And, as detailed above, Petitioners'

own declarant agrees that the Dilley dining situation has improved.  See Fluharty Suppl. Decl., ¶

5.

       At bottom, then, ordering Petitioners' release now would run contrary to the principle

that a "district court should approach issuance of injunctive orders with the usual caution," and

"exercise its discretion if appropriate by giving prison officials time to rectify the situation before

issuing an injunction" at all, let alone one ordering blanket release.  Farmer v. Brennan, 511 U.S.

825, 846–47 (1994) (citing Bell, 441 U.S. at 562).  As the D.C. Circuit has put it, although a

district court's equitable power to redress constitutional injuries is broad, it is only "after local

authorities have been found wanting at the remedial stage" that "the [Supreme] Court [has]

emphasized the breadth . . . of [that] equitable power" and blessed "the imposition of a far-

reaching and highly intrusive remedy."  Barry, 844 F.2d at 842 (citing Hutto v. Finney, 437 U.S.

678 (1978)).  These precedents, moreover, arose in the context of permanent injunctions based

on facts established by admissible evidence.  The "far-reaching and highly intrusive remedy" of

release is even less appropriate in this posture.

Petitioners again rely on <u>Flores</u>, arguing that their "request for release mirrors the remedy Judge Gee deemed appropriate for child Petitioners based on the unsafe and deteriorating conditions of confinement" at the FRCs.  <u>See</u> PI Reply at 11.  Judge Gee, though, did not order release for <u>all</u> minors (as Petitioners suggest) but rather only for those detained longer than twenty days.  As discussed above, this suggests that she did not order release solely as a <u>remedy</u> for ICE's ongoing lack of full compliance with paragraph 12 of the FSA.  Instead, in response to the agency's "uneven[]" implementation of its protocols, she entered exactly the kind of tailored order Petitioners have not sought from this Court — namely, compelling ICE to "urgently <u>implement</u> the protocols recommended by the CDC."  <u>Flores</u>, 2020 WL 3488040, at *2; <u>see also</u> <u>id.</u> at *3 (requiring "more effective" social distancing, enforcement of "masking protocols . . . at all times," and "greater use of testing . . . for staff, new entrants, and residents").

Petitioners cite several out-of-circuit cases in which they claim district courts ordered release of ICE detainees in response to COVID-19.  <u>See</u> <u>Yanes v. Martin</u>, No. 20-216, 2020 WL 3047515 (D.R.I. June 2, 2020); <u>Zepeda Rivas v. Jennings</u>, No. 20-2731, 2020 WL 2059848 (N.D. Cal. Apr. 29, 2020); <u>Savino v. Sousa</u>, No. 20-10617, 2020 WL 1703844 (D. Mass. Apr. 8, 2020).  None of those decisions is apposite, however, because none enjoined ICE to categorically release detainees.  Instead, each court held that detainees were entitled to individualized bail determinations during which the court would scrutinize "medical risks, . . . criminal and immigration history, [and] the danger if any to public safety presented by the release of that particular detainee."  <u>Yanes</u>, 2020 WL 3047515, at *6; <u>Zepeda Rivas</u>, 2020 WL 2059848, at *3 (limiting relief to "requiring ICE to provide information and access to detainees to facilitate a process of considering bail requests"); <u>Savino</u>, 2020 WL 1703844, at *1 (stating that Court was "not yet ready to rule on the underlying habeas petition or the motion for a preliminary

injunction" seeking "release or implementation of social distancing and other hygienic practices").

Both <u>Flores</u> and the above-cited decisions thus provide examples of narrower remedies that courts have ordered to redress plaintiffs' allegedly unconstitutional conditions of confinement during the COVID-19 pandemic.  Petitioners here could similarly seek an order compelling ICE to undertake specific preventive measures, such as, say, more robust contact tracing or in-house employee testing.  <u>Cf.</u> PI Reply at 5 n.4 (suggesting that ICE's contact tracing is inconsistent in practice); Tr. of PI Hearing (July 13, 2020) at 6:17-19 (noting that FRC employees are not tested by their employer but instead must seek tests offsite).  Petitioners could also pursue the equivalent of bail hearings by bringing individual rather than quasi-class claims, seeking release based on their individual circumstances, including, if applicable, high-COVID-risk medical conditions.  <u>Cf.</u> <u>Fraihat</u>, 2020 WL 1932570, at *20.  Because Petitioners have not clearly shown that narrower remedies such as these would not rectify the due-process violations they allege, the Court concludes that they are not, at this juncture, entitled to an injunction ordering their release.  This is not to say that a further erosion of safety standards at the FRCs or a substantial additional spread of the virus there might not subsequently lead the Court to conclude that the balance tips in Petitioners' favor.  At this point, however, it does not.

The Court acknowledges that, in light of Judge Gee's order, at least some Petitioners now face the heart-rending choice between handing over their children, in some cases to potentially unsuitable guardians, and keeping them in the FRCs to face an unknown virus risk.  That is a painful dilemma for any parent.  Petitioners, though, have not argued that being put to that choice somehow represents an independent violation of their constitutional rights.  Instead, they contend that the prospect of separating from their children should be analyzed as irreparable

harm.  <u>See</u> PI Reply at 8.  Yet, as explained above, a showing of irreparable harm here is insufficient to garner relief.  Because Petitioners have not clearly shown that only release can redress the asserted violation of their due-process rights, the Court must deny their Motion.

## IV.     Conclusion

Petitioners, fearful as we all are of contracting a novel and dangerous disease, understandably swing for the fences in seeking wholesale release.  Those fences are high and hard to clear, however, as Petitioners must demonstrate that no court-ordered remedy other than their release will do.  Courts in this district have adhered to that requirement during the COVID-19 pandemic.  See <u>C.G.B.</u>, 2020 WL 293511, at *23; <u>Otunyo</u>, 2020 WL 2065041, at *13; <u>Banks</u>, 2020 WL 1914896, at *15; <u>Banks</u>, 2020 WL 3303006, at *18.  The Court today adheres as well. It will therefore issue a contemporaneous Order denying Petitioners' Motion for a Preliminary Injunction.

<u>/s/ *James E. Boasberg*</u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>July 22, 2020</u>

26